CUMBERLAND NATIONAL BANK OF BRIDGETON

*v.*

THEODORE F. D. BAKER et al.

[Filed July 27th, 1898.]

1. A chattel mortgage made upon any personalty in which the mortgagor has either an actual or a potential property will be recognized at law, but equity will support mortgages or assignments of contingent interests and expectations and of things which rest in possibility only.

2. Where two chattel mortgages are about to be made, and all the parties are acquainted with the considerations of both mortgages, and with this knowledge it is agreed that one shall have priority, it does not lie with the mortgagee who has agreed to the priority of the other, to dispute its validity because it was given to secure a pre-existing debt.

3. A chattel mortgage upon all "seeds and crops of whatever kind or description, now in the ground or hereafter to be planted, upon the farm where we now reside," given by a farmer and seed-raiser residing on his farm, where in the ordinary course of husbandry he raises crops, duly verified and recorded, is a valid lien upon an after-planted crop grown upon that farm, as against mortgages thereon, created after the crop was severed.

On bill, answer and testimony.

The bill in this case was filed by the complainant, the Cumberland National Bank of Bridgeton, to foreclose a chattel mortgage given to it by the defendants Baker and wife, to secure the payment of a pre-existing debt owing by Baker to the bank, not yet due, and also several notes not yet due, upon which Baker was bound as endorser and which were held by the bank. The mortgagor was a farmer and seed-raiser, and lived on his farm in Cumberland county, New Jersey, where the mortgaged property was recited in the chattel mortgage to be located.

The mortgage of the complainant was dated on the 5th day of March, 1895, and set forth the schedule of the chattels mortgaged, and, among other things, the articles giving rise to this dispute, in the following words: "And also all the seeds and

crops of whatever kind and description, now in the ground or hereafter to be planted, upon the farm where we now reside."

The chattel mortgage in question was duly acknowledged and verified, and was recorded on the day of its date, in the Cumberland county clerk's office, in the mode prescribed for chattel mortgages.

It contained a clause whereby Baker agreed that it should, upon the property therein mortgaged, be a prior lien to the mortgage given the same day to Garrison & Minch.

Afterwards, but on the same March 5th, 1895, the mortgagors made to the defendants Garrison & Minch, trading, &c., another chattel mortgage upon the same goods and chattels, describing them in the same manner, but adding several lots of fertilizers in the warehouse of the mortgagee. This mortgage was also duly acknowledged, verified and recorded as required by law. The consideration of this second mortgage was in part the securing the payment of an antecedent debt owing by Baker to the mortgagees, and in part the securing the payment of the purchase-money for the fertilizers named in the mortgage and sold by the mortgagees to the mortgagor, coincidently with the making of the mortgage. This later mortgage contained this clause:

"It is hereby expressly covenanted and agreed, by and between the parties to this instrument, that this chattel mortgage is executed and delivered as a lien, subject to the priority of a chattel mortgage upon the same property bearing even date herewith, and executed and delivered by the mortgagors herein named to the Cumberland National Bank of Bridgeton."

At the time when these mortgages were given the mortgagor was in financial difficulty by reason that he had endorsed commercial paper which was about being forced to judgment. He continued in possession of his farm and in the conduct of his business as a farmer and seedsman during the seasons of 1895 and 1896, and raised, severed and disposed of the crops of those years without any interference from the mortgagees. He also continued in possession during the season of 1897, and had planted seeds and crops upon the farm where he had resided, named in the chattel mortgage of the complainant, and was then in the conduct, on his farm, of his business as a farmer and seed-

raiser, and had partly harvested his crop for the season of 1897. He had paid nothing on either of the mortgages.

On the 30th day of August, 1897, he executed a chattel mortgage to the defendant William O. Garrison, to secure him for a previous indebtedness arising from money loaned and goods sold, and on the same day executed to the defendants Garrison & Minch, trading, &c., an additional chattel mortgage to secure them for the indebtedness outstanding on their above-mentioned mortgage, which yet remained wholly unpaid.

These two mortgages were dated, acknowledged, verified as to consideration, &c., and recorded on August 30th, 1895, and each had annexed the same schedule of property mortgaged, including the following clause, which is the basis of the claims of the defendants Garrison & Minch, trading, &c., and of William O. Garrison (who is a member of the firm of Garrison & Minch) of their right of priority to the complainant in the property in dispute:

"All my crops, seeds, products of the soil, whether the same be now growing or which I have grown and harvested in the course of my business as aforesaid and are now in my possession.

"All manure and fertilizers, and generally all personal property except household furniture owned by me in connection with my business aforesaid."

The complainant filed its bill to foreclose and a receiver was appointed, who sold the crops grown in the year 1897, and the whole question in dispute is based substantially upon the contention of the defendants Garrison & Minch, trading, &c., and William O. Garrison, that their mortgages given on August 30th, 1897, are liens upon the crops grown in 1897, and that the complainant's mortgage was not a lien on those crops; that the proceeds of the sale of them in the receiver's hands in this suit should not be paid in satisfaction of the complainant's prior mortgage, but to them on their later mortgages.

*Mr. William A. Logue,* for the complainant.

*Mr. Walter H. Bacon,* for the defendants Garrison & Minch and William O. Garrison.

GREY, V. C.

The defendants suggest that the complainant's mortgage was intended to hinder creditors because the mortgagor disclosed his threatened financial embarrassment to the complainant and proposed giving the mortgage, and that the delay in foreclosing suffered the mortgagor to sell off crops of large value, and that this operated as a fraud upon creditors. The evidence did not lead me to believe there was any fraudulent purpose either in the inception of the complainant's mortgage or in its omission to foreclose it. So far as there was any delay in its foreclosure, the defendants themselves were in the same position as the complainant—they took their mortgage of March 5th, 1895, at the same time, on the same property, and might themselves have foreclosed had they chosen to do so. It is no answer to say that the complainant's mortgage was paramount. The defendants, if they recognized the complainant's mortgage, could have redeemed it, and thus forced a realization, or if they disputed it, could have contested it with the same result. In my view there is no showing of a fraudulent intent on the part of the complainant to hinder or defraud creditors of the mortgagor, but that the delay was rather for the purpose of giving the mortgagor a chance to pay off his indebtedness without legal steps, if that were possible. The testimony of the defendant Garrison, stated that the defendants Garrison & Minch took their mortgage of March 5th, 1895, in order that the mortgagor might not be annoyed by his endorsements of Ely & Company paper, and might continue his business. This does have a color of hindering creditors of the mortgagor, but it is the defendants' mortgage and not the complainant's which is thus impugned. Any creditor who chose might have forced a sale, and neither mortgage appears to have been used to prevent others from proceeding against the defendant. Fraud is not shown merely by the fact that the debtor voluntarily secured the claims, and that the secured creditor did not sue as soon as he might, there being no proof of collusive action between the secured creditor and the debtor for the purpose of hindering or preventing other creditors.

The defendants contend that the complainant's mortgage, because taken to secure a pre-existing indebtedness, is invalid as against the Garrison & Minch mortgage, which was given in part to secure a presently-passing consideration, and *Milton* v. *Boyd, 4 Dick. Ch. Rep. 142*, is cited in support of this contention.

In that case Vice-Chancellor Pitney made an elaborate examination of previous cases on this subject and determined that a chattel mortgagee whose mortgage was given to secure a pre-existing debt is not a mortgagee in good faith, under the fourth section of the Chattel Mortgage act, as against creditors, as to whom an unrecorded prior mortgage is void by the terms of that section. The line of the earlier decisions is somewhat in conflict upon the point. The supreme court in a recent opinion (*Knowles Works* v. *Vacher, 28 Vr. 500*) reviews the same cases quoted by the learned vice-chancellor and takes the opposite view, holding that it is only under those statutes which require a mortgage to have been given for *a valuable consideration*, as well as in good faith, that a recorded mortgage securing an antecedent debt cannot supplant a prior unrecorded mortgage; that the Chattel Mortgage act only requires the mortgage to have been given *in good faith* in order to bring its holder into the class as against which the unrecorded mortgage is void, and that a mortgage to secure a pre-existing debt is in good faith and within the protection of the statute.

Neither construction of the fourth section of the statute is of any avail to give a preference to the defendants' mortgages.

*Milton* v. *Boyd*, so far as it has application to the case under consideration, is against the defendants' contention. Boyd's chattel mortgage, which was held to be supplanted by Milton's, was last in delivery and was postponed, though first recorded, because held not to be within the class of subsequent mortgages in good faith, as against which an unrecorded mortgage was declared by the statute to be void. In the case in hand the complainant's mortgage was not only first recorded, but was also first delivered, so that, being untainted by fraud, it was a precedent lien to the mortgage of the defendants, under

the doctrine expounded in *Runyon* v. *Groshon* and other cases (*ubi post*), irrespective of the record under the statute.

. On the other hand, if the rule laid down by the supreme court in *Knowles Works* v. *Vacher*, *ubi supra*, be followed, the complainant's mortgage, though given to secure a pre-existing debt, was yet in good faith and was thus entitled, on being recorded, to receive the priority which is given by the statute.

But in my view the case in hand does not call for the consideration of the construction of the fourth section of the statute. The mortgagor expressly covenanted that the complainant's mortgage should be prior to the mortgage given to the defendants Garrison & Minch on the same day, March 5th, 1895, and the latter's own mortgage contained a like provision. Both the complainant's and defendants' mortgages of that date were drawn at the same time and under an agreement of all the parties that the complainant's should be the prior lien. The complainant's mortgage was in fact the first one delivered and recorded. The defendants had, therefore, not only actual and constructive notice of the existence of the prior mortgage of the complainant, but they had actually agreed by the clause in their own mortgage that the complainant's mortgage should have priority, and if by any mishap the defendants' mortgage had been first recorded, the complainant would have had an equity to have its mortgage put in its proper place of priority.

It is no answer to this to say that the complainant parted with nothing for its mortgage, while the defendants gave a presently-passing consideration for their mortgage. All the parties were informed of the whole transaction, and it was on the faith of their agreement that the complainant's mortgage should be prior to the defendants', that the latter obtained their mortgage. It would be inequitable to permit them to retain their own mortgage thus secured, and to dispute the priority of the complainant's mortgage which they had agreed should be first.

The mortgage of the complainant and those taken by the defendants on August 30th, 1897, stand to each other on this point in the same position as do those dated March 5th, 1895. Those taken on August 30th, 1897, were both received as securi-

ties for pre-existing debts. That of Garrison & Minch was given for precisely the same debt as was secured by their previous mortgage of March 5th, 1895; that of the defendant William O. Garrison for an outstanding indebtedness of Baker, the mortgagor, to him personally. The defendants, both Garrison and Minch, knew of the previous mortgage of the complainant when they took their mortgages of August 30th, 1897. Under the rule as stated in *Milton* v. *Boyd, ubi supra,* if the prior record of the complainant's mortgage did not protect it, because that mortgage was given to secure a precedent debt, the absence of the aid of the record did not avail the defendants, because both of their mortgages taken on August 30th, 1897, had the same infirmity ; they, also, were both taken to secure debts pre-existing their creation, and, under the doctrine in *Milton* v. *Boyd,* their holders were not subsequent mortgagees in good faith, and the precedent mortgage of the complainant, whether recorded or not, was not void as to them. They knew of its priority when they took their mortgages, and were bound by it, when it is shown to have been honestly given with no purpose to defraud creditors. If the rule declared in *Knowles Works* v. *Vacher* be applied, the mortgage of the complainant being in good faith, they were bound by its previous record.

I also think that as far as the later mortgage of the defendants Garrison & Minch covered only the same goods as were included in their previous mortgage, those defendants were bound by their covenant to recognize the complainant's mortgage as prior to their own. The complainant's mortgage was not illegal in any sense, and they could not avoid their agreement that the complainant's mortgage should have priority over theirs, by taking another mortgage upon the same property.

The defendants further claim that the complainant's mortgage is invalid so far as it is asserted to be a lien upon the crops raised in the year 1897, which have been sold by the receiver, the proceeds of which sale await distribution in this cause, contending that an unplanted crop cannot be made the subject of a chattel mortgage.

This question turns upon the extent and validity of the lien

of the complainant's mortgage. The clause in the complain-ant's mortgage which is claimed to include the crops raised in 1897 is: "And also all the seeds and crops, of whatever kind and description now in the ground or hereafter to be planted upon the farm where we now reside."

At the time this mortgage was given, the mortgagor, Baker, was in the actual possession and cultivation of the farm on which the seeds and crops named in the mortgage were in the ground or to be planted. At the date of the mortgage—March 5th, 1895—it is probable that no crops were growing on the farm, certainly those now in question were yet to be planted, for it is the proceeds of the sale by the receiver of the crops (largely onion seed) raised in 1897 which are in dispute.

The defendants insist that the mortgagor had neither right nor power to mortgage an unplanted crop, a thing not yet in existence.

In order that a vendor may make a sale either conditional or absolute, it is necessary that he shall have a present property in the thing sold. This property may be either actual or potential —that is, the vendor may actually have the subject-matter of the sale at the time when the contract is made, or he may at that time occupy such a position to the property dealt with that it is reasonably certain to come into being, subject to his disposition, and in such case the sale transfers the property as soon as it is extant, though in the later cases some act of possession seems, at law, to be required. Such a sale was sustained at law as long ago as the case of *Grantham* v. *Hawley, Hob. 132,* which was a grant by a lessor of such corn as should be growing upon the leased ground at the end of the term of twenty-one years. It was objected that it was a mere contingency whether there should be a crop of corn growing at the end of the term, and that the lessor never had any property in the corn, and, therefore, could not grant it, yet it was held that the right to the corn standing at the end of the term being certain, accrued with the land to the lessor, and he might lawfully dispose of it. What may be potential property, capable of being dealt with by a sale, is well illustrated by the discussion in the case of *Petch* v. *Tutin, 15*

*Mees. & W. 115.*  In that case a tenant, in order to secure an indebtedness, assigned a large amount of property, "and also all the tenant right and interest yet to come and unexpired," and the question debated was whether the crops not sown at the time of the assignment passed by it.   The trial judge thought they did not, but, on rule to show cause, it was argued that they did, because the tenant in possession of the farm had a *potential inter-est* in the after-planted crop.   Chief-Baron Pollock accepted the argument, and stated the principle to counsel thus : " Your distinction seems to be this, the party cannot grant the next year's crop of wool of sheep he has not got, but he may grant the next year's wool of the sheep he has got ; " and the whole court agreed that the trial judge was in error, and directed a verdict for the assignee of the after-planted crop.

This doctrine has been enforced in the law courts upon the ground of the potential existence of the subject-matter of the conveyance.   A mortgage by a lessee of crops yet to be planted on the land of which he is in possession was held, in an action of replevin, to be a disposition of things which had a potential existence when dealt with by the lessee, a farmer in possession of the land in which the crops were to be planted in the ordinary course of husbandry.   *Arques* v. *Wasson, 51 Cal. 622.* Professor Dwight, sitting as a commissioner of appeal, held, in an action of trover, that a clause in a lease of a farm creating a lien securing the payment of rent " on all goods   *   *   *   and other personal property which may be put upon said premises," covered crops subsequently raised on the farm, and operated in equity to transfer the interest of the tenant immediately that the new property came into existence.   *McCaffrey* v. *Woodin, 65 N. Y. 459.*   The reasoning of the courts of law in the later cases proceeds upon the idea that the contract is a continuous agreement, operating as a power, and perfecting the interest of the creditor as soon as any act is done in the nature of an execution of the power.   A very clear statement of the general rule as to the operation of a transfer of after-acquired property may be found in the opinion of Lord Chelmsford in *Holroyd* v. *Marshall, 10 H. L. Cas. 220,* where he declared that at

law a disposition of after-acquired property passes no title until possession is taken, or by some equivalent *novus actus interveniens*, dominion over it is assumed by the assignee; but in equity the moment the property comes into existence the agreement operates upon it.

Under this view, one in the ownership of lands may assign an interest in crops thereafter to be planted on those lands which, being of a potential property, would pass the interest conveyed even at law. In the case in hand the mortgagor, Baker, was the possessor of the lands in which the after-planted crop was mortgaged; he was personally engaged in the production of the crops of the very character in dispute (onion seeds) in the usual course of husbandry, and, applying the doctrine above stated, he appears to have had such a potential interest in after-planted crops that he might, in the consideration of a court of law, convey it.

If there be any question of the *status* of a mortgage made by a tenant or owner of lands on after-planted crops in the view of a court of law, there is little doubt that such an agreement will be sustained in a court of equity. While the rule at law requires an actual or potential ownership, equity will support assignments of contingent interests and expectations, and of things which have no actual or potential existence and which rest in mere possibility only. *Smithurst* v. *Edmunds, 1 McCart. 418,* where an assignment by way of security of articles (furniture of a hotel) yet to be purchased, was held to be an equitable mortgage. It will be noted that in this case the articles charged were actually non-existent when the mortgage was given, and in order to bring them in relation to it, the mortgagor was obliged to purchase them and bring them upon the property. The distinction between the rule at law and in equity declaring that the equitable title to things not in actual existence may pass by assignment is elaborated by Chancellor Green in the case last cited, which is approvingly referred to by the court of errors in *McFarland* v. *Stanton Manufacturing Co., 8 Dick. Ch. Rep. 650.*

The complainant's mortgage is also criticised because it did not specify the year when the after-planted crop was to be raised,

which it is claimed was essential as against the claims of third persons. This objection is based upon the argument that the designation of the subject-matter of the contract is so uncertain that subsequent creditors may not be notified of the extent of the claim of the mortgagee unless the year in which the after-planted crop was to be raised was named in the mortgage. The mortgage in substance notifies all who read it that all crops raised after March 5th, 1895, on the farm where the mortgagor then resided were included in the mortgage. The designation is entirely free from doubt or confusion. The mortgagor resided on the farm and was engaged in the business of planting and raising the crops referred to, and had as much right to mortgage all of them as those of a specified year, and parties interested were just as effectually warned by a description of all crops planted after the named date as they would have been had those of a particular year been named. It suited the purposes of the parties to mortgage all that should be subsequently planted, and if the contract fairly described all, it cannot be said to be either misleading or non-informing. I can readily see that the financial situation of a mortgagor might be such that his necessities could only be satisfied by conveying all, rather than some part, of such uncertain values as crops yet to be grown, as security to those who might be willing to aid him. All who dealt with him after record of such a mortgage were fairly advised that his after-raised crops were charged by it.

The defendant also contends that under our recording act neither at law nor in equity can a valid chattel mortgage be made upon property not capable of immediate delivery and continued change of possession, and that an after-planted crop cannot be so delivered or possessed; that as only the severed crop can be so possessed, it is only the severed crop which can be mortgaged.

The defendant assumes that it is the Chattel Mortgage act which grants the power to deal with property by way of chattel mortgage, and that this power can only be exercised in relation to such chattels as are within the purview of that act, namely, such as are capable of immediate and continued possession. But

this is an error.   The power to assign and transfer property by way of chattel mortgage was exercised and recognized by our courts before there was any statute relating to chattel mortgages. *Runyon* v. *Groshon, 1 Beas. 86; Miller* v. *Shreve, 5 Dutch. 250.* But the mortgagee was then obliged to carry the burden of showing as against creditors of the mortgagor, that his mortgage was taken without fraud, and that the possession of the chattels by the mortgagor was not contrived or permitted for any fraudulent purpose.   See instructive history of the origin of the Chattel Mortgage act in the opinion of Vice-Chancellor Pitney, *Roe* v. *Meding, 8 Dick. Ch. Rep. 355,* &c.   To relieve the mortgagee of this burden, and to warn all persons who might deal with the mortgagor in possession of the goods and give him credit on that account, the original Chattel Mortgage act of 1864 and its various amendments were passed.   These acts did not confer a power to make chattel mortgages ; that power had been in existence before the statutes, and the exercise of it was the occasion of the passage of those acts.   They declared that mortgages of goods which were not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, should be void as against creditors and subsequent purchasers and mortgagees, &c., unless verified and recorded in the mode prescribed by those statutes. The reason and spirit, and indeed the language of these acts, seem to apply only when the goods mortgaged are capable of such open and visible possession that their holding by a mortgagor who had given a secret mortgage might tempt some one to deal with him as the absolute owner, and it has been held that mortgages of choses in action, or other personal property which is not of a visible character, are not within the operation of those acts.   *Williamson* v. *Railroad Co., 11 C. E. Gr. 403; Bacon* v. *Bonham, 12 C. E. Gr. 212; Bleakley* v. *Nelson, 11 Dick. Ch. Rep. 674.*   But a chattel mortgage of goods other than those of the class to which the chattel mortgage statute applies, might lawfully have been made before the statute, and may still be made, and it will be effectual to protect the mortgagee, but in such cases he is not obliged to conform to the requirements of

the chattel mortgage statute in order to make his mortgage a valid contract. See cases last cited, all of which were valid, equitable assignments to secure debts, or mortgages of personal property, not within the operation of the chattel mortgage statutes.

If the complainant's mortgage upon after-planted crops is not within the purview of the Chattel Mortgage act as the defendants insist, then the result is, not that it is invalid because of those acts, but that they had no application, and the complainant was not compelled to comply with the conditions prescribed by those acts in order that his mortgage might be valid. I have, however, considered it as if within the operation of the requirements of the Chattel Mortgage act.

So far as the relations of the defendants to the mortgaged property and to the mortgagor and the complainant are concerned they have, in the view of a court of equity, no claim whatever to superior consideration. They stand as to their mortgage of March 5th, 1895, as actual convenantors that the complainant's mortgage should be the first lien, and as to both their mortgages of August 30th, 1897, as holders of liens received as securities for pre-existing debts, with full knowledge that the complainant was already the holder of a previous charge thereon ; and if a record notice to them be required under the Chattel Mortgage acts, they also had this constructive notice. The effort of the defendants to defeat the complainant's preference is not that of a creditor who has been misled into dealing with a mortgagor who had given a secret mortgage now sought to be enforced to the creditors' injury, but it is that of mortgagees who in receiving their mortgage agreed that the complainant's mortgage should have a preference, who now seek to avoid the effect of their own undertaking.

Some suggestion has been made that when the defendants took their mortgage of August 30th, 1897, there had been a severance of the crops of that year, and that for this reason their mortgages are entitled to a preference on the severed crops.

When the complainant's mortgage is held good as above indicated, as a lien on the crops thereafter to be planted, the effi-

ciency of the mortgage continues until the crop is applied to the satisfaction of the mortgage. No change in a crop of onion seed, which is an annual product, the result in a peculiar degree of the labor and skill of man, such as severing from the earth, separating from the chaff, packing for market, makes it any less the same crop which was mortgaged. All these incidents may fairly be considered to be steps in raising, cultivating and preparing the onion seed to be a crop.

The complainant's chattel mortgage should be held to be a lien upon the crops raised in the year 1897, and prior to the liens of the defendants' mortgages thereon. I will advise a decree accordingly, with costs in favor of the complainant.