The question to be determined is one of right to priority in payment as between two interpleading defendants, Mercer Feed Company and the United States of America, Governor of the Farm Credit Administration. A third defendant, G. William Conklin, failed to file an answer or a statement of claim. Moneys have been paid into court by the complainant, Stokely Brothers 
Company, Inc., and it has been discharged.
The facts have been stipulated. Mr. Conklin in 1940, operated two farms in Burlington County, complainant owned and operated a cannery in Mercer County, and Mercer Feed Company was a dealer in fertilizers. Mr. Conklin entered into three written contracts with complainant, to grow peas, tomatoes and lima beans, and to deliver and sell them to it at stipulated prices. The first of these contracts was effected March 11th, 1940; it concerned peas. Then, on April 2d 1940, Mr. Conklin purchased from Mercer Feed Company a quantity of fertilizer to be used for the growing of crops upon his lands and, to secure the payment therefor, executed a written assignment of all moneys and demands due and owing or that should become due and owing to him from complainant "for peas, beans and tomatoes delivered" during the year 1940. The assignment was filed with complainant April 3d 1940. The other two contracts were executed April 16th, 1940. One was for the growing, delivery and sale of tomatoes, the other for lima beans.
Complainant was informed by the Governor of the Farm Credit Administration on May 2d 1940, that that agency of the federal government was making a loan to Mr. Conklin and taking a crop mortgage as security. The loan was made May 8th, 1940, and, on that day, to secure the indebtedness, Mr. Conklin executed a promissory note and the crop mortgage here in question. The mortgage was duly filed in the office of the Burlington County clerk on the day of its execution. *Page 554 
It covered "all crops, planted, growing, or to be planted or grown during 1940," upon the two farms of Mr. Conklin.
The fund paid into court is insufficient to fully satisfy the claim of either claimant. This fund, it is stipulated, represents only profit from tomatoes sold under the second contract; no profit resulted from the sale of peas and lima beans.
The object of a court of equity in any consideration of an equitable assignment is to give effect to the intention of the parties. Structural Gypsum Corp. v. National, c., Co.,107 N.J. Eq. 32, 40; 151 Atl. Rep. 839. When the assignment was made by Mr. Conklin to Mercer Feed Company only the contract for the growing and sale of peas had been made. The assignment, nevertheless, recited that a contract had been entered into between Mr. Conklin and the complainant for the growing of peas, beans and tomatoes and the property assigned was: "the sum of all money due from accounts and demands due and owing to me or that shall during the year one thousand nine hundred and forty, become due and owing to me from the Stokely Brothers and Company of Trenton, New Jersey for peas, beans and tomatoes delivered by me to said Company." The sum to become due Mr. Conklin could only be ascertained after all of the peas, lima beans and tomatoes had been delivered to complainant's cannery, had been graded and accepted and the cost of seed and hampers furnished by the complainant had been ascertained and credited. The intent of the parties to deal only with moneys which they assumed would ultimately become due is emphasized by the phraseology employed in other parts of the instrument. A power of attorney was given to "receive and collect the same." A warranty was added "that no other assignments affecting the account herein assigned have been heretofore given to any other person or Corporation and that the Within assignment Constitutes the only lien against orinterest, in said account." (Italics mine.)
The contract for the growing and sale of tomatoes was made two weeks after execution of the assignment to Mercer Feed Company. It provided inter alia, that the grower deliver all tomatoes grown to complainant's cannery; that only "merchantable" tomatoes should be delivered and would *Page 555 
be paid for, that is, tomatoes "that are sound, of fair size, thoroughly red, vine ripened, clean, and in suitable condition for canning and preserving, grading U.S. No. 1's or U.S. No. 2's;" that $19 per ton would be paid for tomatoes graded U.S. No. 1, $10 per ton for tomatoes graded U.S. No. 2, nothing for culls; that the canner might purchase or refuse to purchase tomatoes deliverable after October 5th, 1940; that the canner was free to inspect the tomatoes being grown, and, in the event of a failure or refusal of the grower to deliver all tomatoes grown to it, to enter upon the grower's farm and take the tomatoes. The intent of the parties with respect to the limited legal effect to be given the tomato contract was definitely expressed therein: "The Grower hereby grants to the Company a lien against the Grower's crop to cover such total advances, and any other sums owed by the Grower to the Company."
The validity of a grant or mortgage of a farm crop to be grown, made by a tenant or owner of lands, has long been accepted.Grantham v. Hawley (1615), Hobart 132; 80 E.R. 281; Petch
v. Tutin (1846), 15 Mees W. 115; 153 E.R. 782; CumberlandNational Bank v. Baker (Court of Chancery, 1898), 57 N.J. Eq. 231; 40 Atl. Rep. 850. No specific crop mortgage statute existed in New Jersey nevertheless until 1934 and this, apparently, will be the first case to be reported touching the lien of a mortgage created pursuant to the provisions of the act then adopted. R.S. 4:18-2 reads:
"Any person engaged in the business of farming, crop production or the raising, breeding, fattening or marketing of live stock may enter into an agreement with and borrow funds from a production credit association organized under the farm credit act of one thousand nine hundred and thirty-three, a regional agricultural credit corporation, a federal intermediate credit bank, or any institution which has made arrangements to discount therewith, or to procure funds therefrom on the security of the obligations of the borrower, the reconstruction finance corporation, or the government of the United States or any department, agency or officer thereof, now or hereafter existing, and may secure the same by crop mortgage upon personal property, crops, whether annual or perennial, and fruits, berries, emblements, nursery stock and industrial growing crops, whether any of such crops are grown or growing, or whether the same are to be grown during the existence of the crop mortgage. *Page 556 
"Such crop mortgage shall be a lien on such property which shall be good and valid against the mortgagor, and against all creditors of the mortgagor, and against all subsequent purchasers, transferees, mortgagees, lienors, and encumbrancers of the mortgagor and those claiming under or thru him from the time of the filing thereof as provided for herein."
It is the contention of Mercer Feed Company that by the tomato grower's contract Mr. Conklin transferred to complainant ownership of the tomato plants to be grown and of the tomatoes to be gathered. No property remained in Mr. Conklin, it argues, which could be subjected to the lien of a crop mortgage. The facts stipulated do not, nor do our legal precedents support this argument. While it is true that a provision of the tomato contract reads "that all Tomatoes grown upon the Grower's Farm up to October 5th shall become be the property of the Company as such tomatoes grow and ripen," the contract must be read and construed as a whole. So considered, the intention of the parties becomes manifest. Tomato plants were to remain in the custody and control of the grower until the tomatoes ripened, subject only to inspection by the canner; when the tomatoes were ready for market they were to be gathered by the grower and by him delivered to the canner; tomatoes which did not grade to the required standard and were rejected by the canner remained the property of the grower, and tomatoes ripening after October 5th were his property unless the canner exercised the option of purchase; all tomatoes grown were to be gathered and delivered only to complainant, and were to become its property if and when accepted.
After counsel had submitted a stipulation of facts, the court requested information as to whether or not the Governor of the Farm Credit Administration gave written consent to the sale of the tomato crop by Mr. Conklin. A supplemental stipulation was filed. It concludes with this statement, "no other consent was given by the Farm Credit Administration to any other sale of tomatoes by G. William Conklin." Delivery of the tomatoes to complainant by the grower, it is also stipulated, was pursuant to the terms and conditions of the tomato-grower's contract and the crop mortgage was *Page 557 
effected and notice given by the Farm Credit Administration to complainant "subject to the terms and provisions of the said agreement." Obviously counsel for the mortgagee could not have intended by these statements to agree that the lien of the mortgage was subject to a prior and superior lien created by the assignment to Mercer Feed Company; otherwise a decision by this court would not have been necessary. The facts additionally stipulated, with the other facts previously stipulated, are persuasive that the mortgagee knew, when the mortgage was made, that all three contracts had been effected and that these obligated the mortgagor to deliver and sell his peas, lima beans and tomatoes only to complainant and at its cannery in Mercer County. The supplemental stipulation is silent as to any knowledge or lack of knowledge of the assignment on the part of the mortgagee, although this question was also suggested to counsel by the court. The only logical conclusion to which the court can come in this posture of the case is that mortgagor and mortgagee in creating the mortgage contemplated the removal of crops grown and gathered in Burlington County to Mercer County and their delivery to complainant's cannery, the sale thereof to complainant, and, that the lien of the mortgage should attach to the resulting fund.
In Doughten v. Gray, 10 N.J. Eq. 323, Chancellor Williamson had before him a controversy which arose out of the sale by an assignee for the benefit of creditors of personalty covered by a chattel mortgage. The Chancellor declared: "The assignee having sold the property, and converted it into money, the person who can legally claim under the mortgage has an equitable lien upon the funds in the assignee's hands for payment of this security." Vice-Chancellor Grey, in Cumberland National Bank v. Baker,supra, did not quote Chancellor Williamson or cite the case ofDoughten v. Gray, but said: "the efficiency of the mortgage continues until the crop is applied to the satisfaction of the mortgage." The rule that the lien of a chattel mortgage attaches to the proceeds of a sale of the mortgaged property adopted in these two cases is, it seems to me, peculiarly applicable to a situation such as has been disclosed in the present case — the sale *Page 558 
of a perishable crop by the mortgagor-grower to a canner in fulfillment of a contract obligation accepted by the mortgagee as valid and binding and created prior to the execution of the mortgage.
The arrangement I believe and have concluded was contemplated by Mr. Conklin and the Stokely Company when the crop mortgage was made is a logical one. When it is planned to mortgage farm produce, still to be grown and harvested, the parties must necessarily provide for a situation very different from that which would be presented were the mortgage to be placed on chattels in existence. Particularly is this true when the crop to be pledged as security is a perishable one which must be immediately harvested and marketed. In the present case the contracts provided that complainant should have a prior right of purchase and that the grower should deliver to complainant's cannery all marketable produce grown. Before the Farm Credit Administration made its loan to Mr. Conklin and took the mortgage it was informed or it learned of these contracts. Even before the mortgage was executed it filed a notice with complainant that a loan was being made by it to Mr. Conklin and a crop mortgage taken. The phraseology used in the mortgage clearly indicates the intention of mortgagor and mortgagee to permit the former to fulfill his contract with the canner to gather and deliver produce grown: "* * * the said mortgagor shall retain possession of the property herein mortgaged until default be made in the payment of said note and/or interest or in the performance of any of the conditions of this mortgage, on the condition that he shall take care of the property herein mortgaged in a husband-man-like manner. The mortgagor as a part of the consideration of this mortgage, covenants and agrees that he will properly cultivate the above described land and harvest the crops grown thereon; * * *." Upon breach of its terms and conditions, the mortgage provided that it might be foreclosed and that the mortgagee might enter upon the premises and take possession of and sell the property mortgaged. The mortgage was made, according to the supplemental stipulation filed, subject to the terms and provisions of these contracts — in other words, subject to the *Page 559 
obligation of the mortgagor to gather and to deliver the produce grown only to complainant and for the prices agreed upon, less deductions for seed and hampers furnished.
This thought is not new. Vice-Chancellor Grey, in the case ofCumberland National Bank v. Baker, supra, said: "No change in a crop of onion seed, which is an annual product, the result in a peculiar degree of the labor and skill of man, such as severing from the earth, separating from the chaff, packing for market, makes it any less the same crop which was mortgaged. All these incidents may fairly be considered to be steps in raising, cultivating and preparing the onion seed to be a crop." "When the complainant's mortgage is held good as above indicated, as a lien on the crops thereafter to be planted, the efficiency of themortgage continues until the crop is applied to the satisfactionof the mortgage." (Italics mine.)
When the account assigned to Mercer Feed Company became an enforceable specific money liability the crop mortgage of the Farm Credit Administration was already a valid and subsisting lien against the balance due. This court has declared that an agreement to assign money to be earned in the future is to be treated as an assignment pro tanto of the fund, when, and only when, the probable debt becomes an enforceable liability, and that the equitable title to the money, when earned, is vested in the assignee subject, however, to existing equities and valid prior charges thereon. Cogan v. Conover Manufacturing Co.,69 N.J. Eq. 358; 60 Atl. Rep. 408; 69 N.J. Eq. 809;64 Atl. Rep. 973; 115 Amer. St. Rep. 629. The assignment constituted, in effect, only a promise that when the money became due to the grower from the canner for crops grown and sold, the right to it would be transferred to Mercer Feed Company. It was an assignment of a right expected to arise under a contract not in existence at the time of the assignment.
The rule as to such assignments is succinctly stated inRestatement, Contracts ¶ 154 (2):
"An assignment of a right expected to arise under a contract or employment not then existing is operative only as a promise by the assignor to assign the right and an authorization to the assignee to *Page 560 
enforce it, but neither imposes a duty upon the obligor nor precludes garnishment by the obligee's creditors."
After this statement of the rule appears the following comment:
"It is for reasons of policy that the effect of an attempted transfer of a right which has not yet arisen is limited. In the nature of things it is impossible to make a person owner of a right which does not exist; but even when a future right which has been the subject of attempted transfer does arise, the assignment does not make the assignee owner of the right unless the contract or employment under which the right arises exists when the assignment is made; and not only has the assignor power to revoke the assignment but the debtor may, if he sees fit, fulfill his duty directly to the assignor and disregard the assignment."
In the annotations to paragraph 154 (2) of the Restatement
above quoted, prepared under the auspices of the New Jersey State Bar Association and published in 1936, it is said that no New Jersey case in point was found. Nor since, apparently, have the courts of our state been called upon to decide the question of extending the doctrine of equitable assignments to the transfer of a right it is anticipated will arise out of a contract it is anticipated will be made. Counsel have not directed my attention to any decision in point, subsequent to 1936, nor have I located any such. While in this respect this may be a case of first impression in this state, our courts have in many instances approved and enforced equitable assignments. In the reported cases, however, our courts have emphasized the fact that the right assigned and under consideration grew out of a contract in existence when the assignment was made. Cogan v. ConoverManufacturing Co., supra; Bank of Harlem v. City of Bayonne,48 N.J. Eq. 246; 21 Atl. Rep. 478; affirmed, 48 N.J. Eq. 646;25 Atl. Rep. 20; Brindze v. Atlantic City Policemen's BeneficialAssociation, 75 N.J. Eq. 405; 72 Atl. Rep. 435; affirmed, 77 N.J. Eq. 272; 79 Atl. Rep. 686; Structural Gypsum Corp. v. NationalCommercial Title and Mortgage Guaranty Co. (Court of Errors andAppeals), 107 N.J. Eq. 32; 151 Atl. Rep. 839. Professor Pomeroy (5th ed. ¶ 1283) stresses the point: *Page 561 
"The fund need not be actually in being, if it exists potentially, — that is, if it will in due course of things arise from a contract or arrangement already made or entered into when the order is given, — the order will operate as an equitable assignment of such fund as soon as it is acquired and will create an interest in it which a court of equity will enforce."
Application of the extended rule formulated and set down inRestatement of Contracts to the facts and circumstances before the court, would result in a finding that the United States of America, Governor of the Farm Credit Administration is entitled to priority in payment of its claim out of the fund in court. However, the same finding must result from a careful consideration of the conduct of the parties and a resolution of the facts. Mercer Feed Company did not choose to secure itself by chattel mortgage, it was content to take an assignment of moneys possibly to become due from complainant. The tomato vines and tomatoes were unquestionably permitted by the grower's contract to remain within the power and under the control of Mr. Conklin. Under such circumstances the risk of their being impaired or destroyed would be assumed by the assignee and if, after the assignment of moneys possibly to result from the crop the assignor, in the course of his dealings, did that which would disentitle him to the money, the effect would be that the assignee could take nothing under his assignment. Cogan v.Conover Manufacturing Co., supra. An assignee takes but the place and the right of the assignor as to the portion of the fund assigned and cannot enforce the assignment before the assignor could sue for the fund. Bradley Currier Co. v. Bernz, 55 N.J. Eq. 10; 35 Atl. Rep. 832. A right of action could become mature in the assignee only upon the completion of the grower's contract. Sullivan v. Visconti, 68 N.J. Law 543;53 Atl. Rep. 598; affirmed, 69 N.J. Law 452; 55 Atl. Rep. 1133. In the meantime the assignor continues to own the plants and the produce which could be seized and sold under the ordinary process of law and, of course, mortgaged under the New Jersey crop mortgage statute. Farrow v. Ocean County Trust Co., 121 N.J. Law 344;2 Atl. Rep. 2d 352.
The Governor of the Farm Credit Administration secured the loan made by it to Mr. Conklin by chattel mortgage duly *Page 562 
filed. Before the "account" of Mr. Conklin with complainant could be balanced and the amount due him ascertained and payment enforced, notice had been given by the Farm Credit Administration to complainant of the prospective crop loan and the crop mortgage had been executed and filed. No suggestion is made of bad faith in the giving or obtaining of this mortgage, or of knowledge on the part of the mortgagee of the existence of the assignment. One claimant entrusted Mr. Conklin with fertilizer with which to grow crops; the other loaned him money, presumably to be used for the same purpose. Only one claimant can be paid out of the fund in court and that one only in part. The less prudent and diligent must suffer the loss.
A decree will be advised that the claim of the United States of America, Governor of the Farm Credit Administration be first paid and satisfied out of the fund in court. *Page 563